## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| LINETTE M. SOMBRIGHT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 10 C 2924 |
| v. | ) | |
| | ) | Magistrate Judge Schenkier |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

### MEMORANDUM OPINION AND ORDER[1]

In this administrative appeal brought pursuant to 42 U.S.C. § 405(g), Linette M. Sombright seeks reversal and remand of an adverse final decision by the Commissioner of the Social Security Administration ("SSA") that she is not disabled and therefore not eligible for Disability Insurance Benefits ("DIB") under Title II and/or Social Security Income ("SSI") under Title XVI of the Social Security Act (the "Act"), codified at 42 U.S.C. §§ 416(I) and 423(d). In that decision, the Administrative Law Judge ("ALJ") found Ms. Sombright ineligible for social security benefits as of August 1, 2007, the alleged onset date of her disability. The Commissioner seeks to affirm that decision. Having carefully reviewed the record and the ALJ's decision, for the reasons set forth below, we deny Ms. Sombright's motion (doc. # 22), and we affirm the final decision of the ALJ (doc. # 24).

The following facts are taken from the administrative record, the administrative hearing transcript, and the ALJ's written decision. The Court will first discuss the procedural history of the case, followed by Ms. Sombright's personal and medical history, followed by a summary of the hearing testimony and the ALJ's written decision.

---

[1] On August 18, 2010, by consent of the parties and pursuant to 28 U.S.C. § 636 (c) and Local Rule 73.1, this case was assigned to this Court for all proceedings, including the entry of final judgment (doc. ## 15, 17).

**I.**

We begin with the procedural history.

On December 20, 2007, Ms. Sombright protectively filed a Title II application for DIB (R. 103). The DIB claim was denied initially upon receipt of the application in December 2007 because Ms. Sombright's DIB insured status was not met at or after her alleged onset date (R. 103). According to the initial denial record, Ms. Sombright's last date for DIB insurance was June 2007, but her alleged onset date for disability was October 10, 2007 (*Id.*). In other words, the application was denied because she alleged an onset date after the date she was insured for benefits. The DIB denial, however, made a note that a new Disability Determination Service ("DDS") (a branch of the SSA which deals with initial decisions on disability benefit applications) decision might be required due to a change in the insured status requirements, submission of new and material evidence, or a change in the medical listings (*Id.*). Indeed, it was. In a subsequent "Report of Contact," dated October 28, 2008, the DDS found that the initial determination was erroneous because it did not consider Ms. Sombright's 2007 earnings. The new date of last insured was therefore reset to June 30, 2008 (not 2007) (R. 165).

Meanwhile, on December 19, 2007, Ms. Sombright filed an application for SSI, claiming an onset disability date of August 1, 2007 (R. 100-102, 103). On March 17, 2008, the SSI application was denied upon initial request (R. 100-102) and on May 20, 2008, reconsideration was denied (R. 53, 59).

Subsequently, Ms. Sombright retained counsel and requested a hearing (R. 63-66). She claimed her alleged disability began on August 1, 2007, due to severe obstructive sleep apnea (R.

11, 57; Pl.'s Mem. at 2).[2] The hearing took place before ALJ Cynthia Bretthauer in Evanston, Illinois on November 4, 2008 (R. 18-50). Ms. Sombright was represented by her attorney, David N. Kornfeld; a Vocational Expert ("VE"), William Newman, also appeared and testified (R. 41-49). The ALJ did not request a medical expert to provide analysis of the medical evidence.

On February 4, 2009, the ALJ issued her decision. She found that, although Ms. Sombright suffered from four severe impairments (obstructive sleep apnea,[3] myalgias,[4] obesity, and tobacco abuse), those impairments did not meet or substantially equal any of the impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (R. 13-14). The ALJ then concluded that Ms. Sombright retained the RFC to perform various light level jobs (R. 14-16). Based on the ALJ's hypothetical, the VE identified such jobs to include hand packer, cashier, and cafeteria attendant, all of which were available in significant numbers in the region (*Id.* at 17). As a result, the ALJ found that Ms. Sombright was not disabled and denied her applications in turn (*Id.*). The ALJ's decision was based, in part, on her finding that Ms. Sombright's allegations regarding the intensity, persistence, and limiting effects of her impairments were not fully credible (R. *Id.* at 15-16).

Ms. Sombright filed a timely request for review, which was denied by the Appeals Council on March 17, 2010, making the ALJ's decision the final decision of the Commissioner under 42 U.S.C. § 405(g) (R. 1-3). *Getch v. Astrue*, 539 F.3d 473, 480 (7th Cir. 2008). Ms.

---

[2] This alleged onset date is a change for the DIB claim, in which Ms. Sombright initially claimed an onset of October 10, 2007 (R. 103).

[3] Obstructive sleep apnea is a disorder characterized by recurrent interruptions of breathing during sleep due to temporary obstruction of the airway by lax, excessively bulky, or malformed pharyngeal tissues (soft palate, uvula, and sometimes tonsils), with resultant hypoxemia and chronic lethargy. *Stedman's Medical Dictionary* 119 (28th ed. 2006).

[4] Myalgias are muscle pains. *Stedman's Medical Dictionary, supra,* at 1265.

3

Sombright timely filed her complaint in federal district court seeking judicial review under 42 U.S.C. §§ 405(g), 1383(c)(3).

## II.

The evidence relevant to the present claim, as drawn from the administrative record, is as follows.

### A.

Ms. Sombright was born on January 15, 1963; she was 44 years old as of her alleged disability onset date, August 1, 2007 (R. 57, 103). At the time of the administrative hearing, Ms. Sombright lived in an apartment in Chicago, Illinois with her adopted nephew (a 17-year old minor) who she said helped her with household chores (R. 15, 23).

Ms. Sombright is indigent. She does, however, have 11 years of formal education (R. 16, 24, 145), as well as special training as a beautician and cosmetologist (R. 131). Before the onset of her alleged disability, Ms. Sombright was also gainfully employed as a babysitter, machine operator, and loader in a warehouse (R. 26, 127, 137). Each of those jobs was a light or medium-level unskilled job (R. 43-44).

In May 2007, Ms. Sombright began to complain of sporadic, nightly chest pain and a problem with snoring in her sleep (R. 40, 62, 150). Ms. Sombright stopped her babysitting job in August 2007; and she has not worked since that time (R. 25, 126). Ms. Sombright's income sources have since consisted of food stamps and a monthly stipend from the Illinois Department of Children and Family Services for the care of her adopted nephew (R. 23, 101). She resides in subsidized housing under the provision of Section 8 of the United States Housing Authority Regulations (*Id.*).

Prior to 2007, Ms. Sombright's medical history included a history of total abdominal hysterectomy[5] and an oophorectomy[6] following a diagnosis of fibroids in 1996 (R. 255, 333). She also had a cyst removed from the left side of her breast in 2000 (R. 191).

Treatment records, notes and test results from St. Francis Hospital in Evanston, where her medical care was provided by her primary care physician, Dr. Jonathan Sagum, reflect continuing care from January 12, 2007 through March 27, 2008 (R. 221-243; 244-312). Shortly after the alleged onset date of August 1, 2007, a progress note dated August 23, 2007, indicates that Ms. Sombright would stop breathing for about 10 minutes while sleeping at night; and, to get her to start breathing, she would have to be awakened by her fiancé or daughter (R. 150, 266). Dr. Sagum diagnosed Ms. Sombright with obstructive sleep apnea ("OSA") and hyperlipidemia[7] (R. 266).

On September 1, 2007, Ms. Sombright underwent a complete overnight polysomnogram,[8] at the St. Francis Sleep Disorder Center (R. 263). The report from this test characterizes her OSA as "severe predominantly obstructive sleep apnea" (*Id.*). During a follow-up visit on September 27, 2007, Ms. Sombright was noted to be experiencing sleepiness and fatigue (R. 260). She was advised to lose weight, continue taking Lipitor medication (which had been prescribed for her hyperlipidemia), and to consider using a continuous positive airway

---

[5] A hysterectomy is the removal of the uterus. *Stedman's Medical Dictionary, supra,* at 940.

[6] An oophorectomy is the removal of the ovaries. *Stedman's Medical Dictionary, supra,* at 1368.

[7] Hyperlipidemia, also known as high cholesterol, is an elevated level of lipids in the blood plasma. *Stedman's Medical Dictionary, supra,* at 922.

[8] A polysomnogram is a sleep study that measures multiple physiological variables associated with sleep. *Stedman's Medical Dictionary, supra,* at 1540.

pressure ("CPAP")[9] machine to help her breathe at night (R. 258-262). The assessment from this visit also indicated that Ms. Sombright was told she should stop smoking and drinking alcohol (R. 260).

Ms. Sombright underwent a second overnight polysomnogram on October 5, 2007, which confirmed the findings from the first OSA (R. 201-202). She was advised to continue using "home therapy," which appears to be a Bilevel Positive Airway Pressure ("BiPAP")[10] machine, and to lose weight (R. 201). Also, in October 2007, a bone density test revealed osteopenia[11] in her spine (R. 203-204).

On November 1, 2007, her next follow-up visit with Dr. Sagum, Ms. Sombright received a recommendation for a BiPAP machine to help alleviate her breathing problems (R. 199).

Following an examination on November 29, 2007, in a letter dated the same day, Dr. Steven Horwitz, an otolaryngologist,[12] indicated that Ms. Sombright had a "marked nasal obstruction due to large inferior turbinates"[13] and a partially deviated septum,[14] large tonsils, and

---

[9] Continuous Positive Airway Pressure is a treatment for OSA that provides a steady flow of room air at low pressure through the nose to overcome intermittent upper respiratory obstruction. *Stedman's Medical Dictionary, supra,* at 119.

[10] BiPAP is a treatment for OSA that provides differing pressure during inhalation and exhalation. *See* webmd.com, Breathing Disorders During Sleep, http://www.medhelp.org/lib/breadiso.htm (last visited March 9, 2011).

[11] Osteopenia is decreased calcification or density of the bone. *Stedman's Medical Dictionary, supra,* at 1391.

[12] An otolaryngologist is a doctor who specializes in the ear, pharynx, and larynx. *Stedman's Medical Dictionary, supra* note 2, at 1395.

[13] The term "inferior turbinates" refers to a shell-shaped structure within the muscles of the nose. *Mosby's Medical, Nursing, & Allied Health Dictionary* 379, 1081, 1665 (5th ed. 1998).

[14] The septum is a thin wall dividing the two cavities or masses of softer tissue in the nose. *Stedman's Medical Dictionary, supra* note 2, at 1751.

"overtly excessive, floppy uvulo-palato[15] tissue causing oropharyngeal[16] obstruction and snoring" (R. 196). Dr. Horwitz recommended that Ms. Sombright undergo "turbinate resection[17] and possibly septoplasty,"[18] tonsillectomy,[19] and palatal resection[20] surgery (*Id.*). Dr. Horwitz also noted that Ms. Sombright is "markedly obese and badly needs to lose weight" (*Id.*).

On December 21, 2007, Ms. Sombright was seen in the St. Francis clinic where she was diagnosed with pneumonia (R. 178-184). Her records indicate she complained of four days of body aches, fever, and cough, while doctors found she had chest wall tightness and discomfort (*Id.,* R. 181-82). Physical activity exacerbated her symptoms (*Id.*).

On January 10, 2008, Ms. Sombright returned to the St. Francis clinic, complaining of OSA and lower back pain that radiated to her left thigh (R. 195). Ms. Sombright's chart from this visit notes her history of obesity, OSA, hyperlipidemia, and hot flashes (*Id.*). The back pain, described as a "lumbar strain," was noted to cause problems in ambulation and was exacerbated by walking (*Id.*). Also, as a result of this visit, her CPAP regime was continued with a change to a face mask and she was sent for an x-ray of her lumbar spine (*Id.*).

---

[15] Uvulo-palato refers to the uvula and throat. *See* Sleep Well, Sleep Apnea Information and Resources, http://www.stanford.edu/~dement/apnea.html (last visited March 9, 2011).

[16] Oropharygeal refers to the portion of the pharynx that lies posterior to the mouth. *Stedman's Medical Dictionary*, *supra* note 2, at1382.

[17] Turbinate resection is the partial removal of the mucosal tissues which line the nose and sinuses. *See* sinuscarecenter.com, The Turbinates: Advanced Solutions, http://www.sinuscarecenter.com/treat/surgery_turbinate.htm (last visited March 9, 2011).

[18] Septoplasty is a surgical procedure that corrects defects or deformities of the nasal septum, often by alteration or partial removal of skeletal structures. *Stedman's Medical Dictionary*, *supra* note 2, at 1750.

[19] A tonsillectomy is the removal of the entire tonsil. *Stedman's Medical Dictionary*, *supra*, at 922.

[20] Palatal resection is the partial removal of the bony and muscular partition between the oral and nasal cavities causing airway obstruction. *Stedman's Medical Dictionary*, *supra*, at 1406, 1673.

On January 14, 2008, Ms. Sombright underwent the x-ray of her lumbar spine (R. 200). The x-ray revealed "mild degenerative changes with diffuse anterior osteophyte[21] formation . . . minimal loss of height of the L3-4 and L4-5 intervertebral disc spaces as well as the L2-3 interverted disc space, [and] [s]light hypertrophy[22] of the posterior elements . . . at the L5-S1 level" (*Id.*). Also, on January 14, 2008, Ms. Sombright had an appointment at the St. Francis clinic during which she was advised to stop smoking to increase her bone mass, and to continue using Effexor to help with her hot flashes (R. 247).

On February 3, 2008, Ms. Sombright was admitted to the Emergency Department at St. Francis with a fever and flu-like symptoms, including generalized body aches (R. 30-31, 221-223). She was diagnosed with bronchitis and proscribed Motrin and Zithromax (R. 229). On the following day, Ms. Sombright had a follow-up chest x-ray, which revealed no major lung changes (R. 239).

On May 22, 2008, Ms. Sombright went to St. Francis complaining of stiffness in the right hand for the past month (R. 326). She was told to rest her hand. (*Id.*).

On July 17, 2008, Ms. Sombright went to St. Francis to request refill of her Lipitor medication; the report indicates Ms. Sombright was told to continue with CPAP treatment for her OSA (R. 325). The physician's assessment from the visit includes the following conditions: dyslipidemia,[23] obesity, OSA, and osteopenia (*Id.*).

---

[21] Osteophytes are bony outgrowths or protuberances. *Stedman's Medical Dictionary, supra*, at 1391.

[22] Hypertrophy refers to a general increase in bulk of a part or organ, not due to tumor formation. *Stedman's Medical Dictionary, supra*, at 929.

[23] Dyslipidemia is abnormality in lipids in the blood. *See* sharinginhealth.ca, Dyslipidemia, http://www.sharinginhealth.ca/conditions_and_diseases/dyslipidemia.html (last visited March 9, 2011).

On August 14, 2008, Ms. Sombright returned to St. Francis for a checkup (R. 329-330). The report indicates that Ms. Sombright had again become non-compliant with treatment, as she needed to stop smoking, continue regular exercise, and eat a healthier diet (*Id.*).

Ms. Sombright returned to St. Francis on October 9, 2008, complaining of pain that radiated into the her lower back, at a pain level of about 6/10 (R. 331-332). She was prescribed Naproxen and Flexeril for what was again diagnosed as a "lumbar strain" (*Id.*).

We note that, throughout the entire period of her alleged disability, Ms. Sombright suffered from obesity. In a doctor visit on September 27, 2007, her weight was recorded at 226 pounds (R. 260). When she went to the St. Francis clinic on January 10, 2008, Ms. Sombright weighed 225 pounds (R. 195). On a March 27, 2008 visit, her weight was noted at 221 pounds (R. 325). On her July 17, 2008 visit, her weight was recorded at 228 pounds (R. 327). And, on October 15, 2008, when Ms. Sombright had her annual gynecological exam, her weight was noted at 235 pounds and her height at five feet, three and a half inches (R. 333).

At the time of the hearing, Ms. Sombright was taking several medications. These included: Simvastatin for hyperlipidemia (R. 167); Oyster-D for osteopenia (*Id.*); Venlafaxine (trade name Effexor) for hot flashes (*Id.*); and Naproxen for back pain (R. 28).

**B.**

There are two assessments made by medical consultants hired by the SSA to evaluate Ms. Sombright's physical condition. The first is by Dr. Robert Patey, who performed a physical residual functional capacity ("RFC") assessment for Ms. Sombright on March 11, 2008 (R. 313). The second is an Illinois Request For Medical Advice ("IRMA") performed by Dr. Ernst Bone, dated May 15, 2008. We address each assessment in turn.

1.

In the RFC, Dr. Patey offered a primary diagnosis of obesity with a secondary diagnosis of obstructive sleep apnea or OSA (R. 313). Dr. Patey made this assessment without the aid of a treating or examining source statement regarding the claimant's physical capacities (R. 319). The RFC, like all such assessments, contains a number of boxes that are checked off to describe the consultant's conclusions.

Regarding exertional limitations, Dr. Patey found that Ms. Sombright could occasionally lift or carry up to twenty pounds; frequently lift and/or carry up to ten pounds; stand and/or walk (with normal breaks) for a total of about six hours in an eight-hour workday; and had no limits on her ability to push and/or pull (including operation of hand and/or foot controls). The evidence in the record that Dr. Patey found for his conclusions and the primary diagnosis of obesity included a BMI of 39.9, and a weight of 225 pounds with a height of 63 inches (or 5'3" tall). Dr. Patey also noted that Ms. Sombright suffered from obstructive sleep apnea, hyperlipidemia and hot flashes. He further noted evidence of back pain secondary to muscle strain at the end of December (presumably 2007), without trauma, but with some tenderness aggravated with walking. Her lungs were clear and her hot flashes were stable. She had evidence of "Osteopina L/S" (R. 314). Regarding postural limitations, Dr. Patey noted only two: namely, that she can only occasionally climb ramps and stairs and that she can never climb a ladder, rope or scaffolds.

**2.**

In the IRMA (R. 321-23), Dr. Bone evaluated Ms. Sombright's claim of sleep apnea and chest pain based on a request for reconsideration of a determination dated March 17, 2008.[24] Dr. Bone found that Dr. Patey's RFC should be revised to include new evidence (namely new visits to her attending physician and the emergency room), but he affirmed the prior RFC determination because this evidence did not materially change the findings related to Ms. Sombright's condition. In addition, Dr. Bone noted that Ms. Sombright's "credibility" was "at question," because "her condition is not as severe as she describes it" (R. 323).

**C.**

Ms. Sombright's administrative hearing was held on November 4, 2008 (R. 18). At the hearing, she testified that her inability to work was due to ongoing and worsening medical impairments in 2007 (R. 40). These included obstructive sleep apnea, breathing problems, fatigue, lower back pain, dizziness after sitting, and pain and swelling of the right hand and foot (R. 31-40).

Ms. Sombright described her back pain as sharp and intermittent, exacerbated by walking around or prolonged sitting (R. 31-32). She also claimed that walking and sitting cause her to experience shortness of breath (R. 33). For this reason, she estimated she could stand for an hour and sit for a half-hour (R. 34).

Ms. Sombright testified that the pain and swelling in her right hand, which had been present in the months prior to the hearing, prevents her from carrying heavy items (R. 33). She

---

[24] The Court notes that there is no RFC determination in the record dated March 11, 2008; rather, the initial disability determination, which incorporates Dr. Patey's RFC assessment, is dated March 17, 2008 (R. 51, 53-57). This date is reflected by Dr. Bone on the last page of the IRMA (R. 323), so we conclude that the March 11, 2008 RFC determination he notes at R. 322 is a typographical error.

described this pain as intermittent and exacerbated by writing (*Id.*). During the disability application process, Ms. Sombright acknowledged she could lift 40 pounds (R. 38, 126). But, at the hearing, on account of her back pain and breathing problems, she revised this downward to 20 pounds. She subsequently revised it further downward, during the questioning by her attorney, to no more than a gallon of milk, which she claimed she could lift and carry from one side of the room to the other, but only with only her left hand due to the pain in her right hand (R. 39-40). Ms. Sombright also claimed she could only perform this activity a limited number of times, because it might cause her back to start hurting and exacerbate her breathing difficulties (*Id.* at 40). In addition, Ms. Sombright testified she has foot swelling when she walks too much (R. 34).

Ms. Sombright testified that she uses the CPAP machine in order to help her breathe, which she indicated helped her sometimes (R. 29, 167). Despite her regular use of the machine, however, she can only sleep for two hour intervals, waking up "gagging for air" (R. 38, 58). Ms. Sombright suggested this caused her to routinely fall asleep in the afternoon while watching television in a reclining position (R. 37-38). Specifically, Ms. Sombright testified that she has trouble watching a two-hour program through to its completion because she falls asleep for a half hour to an hour (*Id.*). Ms. Sombright further testified that, in spite of her breathing problems and doctor's advice, she still smokes approximately five cigarettes approximately "once out of the week" when she is "nervous about some things and when [she] get[s] upset" (R. 31).

Ms. Sombright additionally testified that she currently resides with her adopted nephew. When she is at home, most of her free time is spent watching television. While her nephew helps her with household chores, Ms. Sombright testified that she is able to dust, make her bed,

**12**

wash dishes, and cook independently (R. 15, 35). She also goes grocery shopping and out to eat occasionally (*Id.* at 35).

Ms. Sombright also testified that she tried to lose weight by eating less, doing knee bends or arm raises, and walking for exercise; but, she could only walk a block and a half due to her breathing problems, needing to rest for 15-20 minutes to catch her breath (R. 30, 34). In her original application for disability benefits, filed on December 20, 2007, Ms. Sombright stated she could only walk about a half block before experiencing shortness of breath (R. 126, 136). However, after filing her application, but prior to her administrative hearing testimony, Ms. Sombright indicated she could walk two blocks before having to stop and catch her breath (R. 150, 153).

Finally, Ms. Sombright testified she considered having the turbinate resection and septoplasty surgery recommended to her by Dr. Horwitz to alleviate some of the causes of her sleep apnea. However, she did not go through with that surgery because she was afraid to undergo the procedure (R. 30).

Following Ms. Sombright's testimony, William Newman, the VE, gave his testimony (R. 43). The VE testified that Ms. Sombright's past employment was generally unskilled medium level work (*Id.*). The ALJ then posed three hypotheticals to the VE (*Id.*).

In the first hypothetical, which was identical to the RFC given by the first state medical consultant, Dr. Patey, the factors included: an individual with the same age, experience, and education as Ms. Sombright, who could sit for 6-8 hours per day, stand and walk at least 6-8 hours per day, lift and carry up to 10 pounds frequently and 20 pounds infrequency, and who could climb stairs and ramps but not latters, ropes, or scaffolds (R. 43-44, 313-320). The VE

13

testified that there are unskilled light jobs that someone with this RFC could perform (R. 43-44). These include: (1) hand packer, of which there are 15,910 jobs in Chicago and the surrounding counties; (2) cashier, of which there are 80,520 jobs in Chicago and the surrounding counties; and (3) cafeteria attendant, of which there are 20,666 jobs in Chicago and the surrounding counties (R. 44). The VE's job estimates, which included both full and part-time jobs, came from the Bureau of Labor Statistics and were current as of the third quarter of 2007 (R. 48).

In the second hypothetical, the ALJ kept the same factors as the first hypothetical but added that the person must avoid concentrated exposure to pulmonary irritants (44). The VE testified that this would not change the outcome, and that all of the previous jobs would still be available *(Id.)*.

In the third hypothetical, the ALJ kept the factors constant with the added restriction that the person was limited to sedentary work (44). The VE testified that there are jobs someone with this RFC could perform *(Id.)*. These include: (1) sorter, of which there are 12,840 jobs in Chicago and the surrounding counties; and (2) bench assembler, of which there are 43,881 jobs in Chicago and the surrounding counties *(Id.)*.

Ms. Sombright's attorney then cross-examined the VE, changing the original hypothetical to limit the person to only having the ability to sit for 3-4 hours per day and stand and walk at least 3-4 hours per day (R. 45-46). The VE testified that if this were the case, all of the previous jobs would be unavailable, because they are all full-time *(Id.* at 46). Ms. Sombright's attorney then posed a second hypothetical, modifying the original hypothetical to include the person being off task for a period of two hours throughout the day, for sporadic 15 minute periods *(Id.* at 47). The VE testified that this would also eliminate all of the previous

14

jobs. Finally, Ms. Sombright's attorney posed a third hypothetical, changing the original hypothetical to include the claimant missing three days of work per month (*Id.* at 47). The VE testified this too would eliminate all of the previous jobs (*Id.*).

## D.

The ALJ issued her decision on February 4, 2009. The ALJ found that, while Ms. Sombright suffered from several severe impairments, including OSA, myalgias, obesity, and tobacco abuse. However, that ALJ found that Ms. Sombright's RFC still allows her to perform light work as defined in 20 C.F.R. §§ 404.1567(b), 416.967(b), except that she must avoid: climbing latters, ropes or scaffolds; concentrated exposure to pulmonary irritants; and climbing stairs and/or ramps more than occasionally (R. 14-17).

As a result of these limitations, the ALJ found that Ms. Sombright was unable to perform any of her past relevant work as a machine operator, a loader, and a babysitter, all jobs which were classified at the medium-level of exertion (R. 16, 42). Considering Ms. Sombright's age, education, work experience, and RFC, the VE testified that she would be able to perform the requirements of representative light level jobs such as hand packer, cashier, and cafeteria attendant (R. 17). The VE stated that each of these jobs exists in significant numbers in the national economy (R. 16-17). Based on this evidence, the ALJ found that Ms. Sombright is capable in making a successful adjustment to such light level work, and found Ms. Sombright not disabled (R. 17).

## III.

We begin our analysis with a brief overview of the relevant legal standards governing appeals from the Commissioner's final decisions. To establish disability under the Social

Security Act, 42 U.S.C. §§ 416(I), 423(a)(1)-(2)(A), and 1382c(a)(3)(A), the claimant must show the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." *Id.* § 423(d)(1)(A). Substantial gainful activity includes work of the type a claimant did before the impairment and any other kind of gainful work generally available in the national economy. *Id.* at § 423(d)(1)(A).

The social security regulations contain a required five-step sequential analysis for determining whether a claimant is considered disabled under the law. 20 C.F.R. § 404.1520(a)(4). These steps are evaluated sequentially and require the ALJ to determine: (1) whether the claimant is currently performing any "substantial gainful activity;" (2) whether the claimant's alleged impairment or combination of impairments is severe; (3) whether any of the claimant's impairments meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) whether the claimant is unable to perform his or her past relevant work based on her RFC; and (5) whether the claimant's RFC renders her unable to perform any other work existing in significant numbers in the national economy. 20 C.F.R. § 404.1520(a)(4); *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005).

The claimant has the burden of proof in Steps 1 through 4. 20 C.F.R. § 404.1520(g)(1). By satisfying this burden, the claimant makes a *prima facie* case of disability, and the burden shifts to the Commissioner in Step 5 to prove that significant jobs are available in the national economy for an employee with the claimant's RFC. 20 C.F.R. §§404.1520(g); *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). A vocational expert's testimony, if it is reliable, can satisfy

the Commissioner's burden of determining whether a significant number of jobs exists in the economy. *Overman v. Astrue,* 546 F.3d 456, 460 (7th Cir. 2008).

The Social Security Act authorizes judicial review of final decisions made by the Social Security Agency. 42 U.S.C. § 405(g). Upon review, a court will only consider whether the ALJ's findings are supported by substantial evidence, rather than mere speculation, and were made under the correct legal standard. *See Lopez v. Barnhart,* 336 F.3d 535, 539 (7th Cir. 2003). In issuing her opinion, the ALJ must, at minimum, state her analysis of the evidence so a reviewing court can make an accurate decision. *Scott v. Barnhart,* 297 F.3d 589, 595 (7th Cir. 2002). Although an ALJ is not required to address all the evidence, "the ALJ's analysis must provide some glimpse into the reasoning behind [the] decision to deny benefits." *Zurawski v. Halter,* 245 F.3d 881, 889 (7th Cir. 2001). Specifically, the ALJ must build an "accurate and logical bridge from the evidence to her conclusion" *Clifford v. Apfel,* 227 F.3d 863, 872 (7th Cir. 2000), "so that, as a reviewing court, we may assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Scott v. Barnhart,* 297 F.3d 589, 595 (7th Cir. 2002).

Further, we must be able to "track" the analysis to ensure the ALJ considered all the important evidence. *Diaz v. Chater,* 55 F.3d 300, 308 (7th Cir. 1995). If the ALJ's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002). In determining whether the ALJ has satisfied this burden, the court will not re-weigh evidence, resolve material conflicts, make independent findings of fact, make decisions of credibility, or substitute its judgment for that of the Commissioner. *See Boiles v. Barnhart,* 395 F.3d 421, 425 (7th Cir.

2005). Thus, even if reasonable minds could disagree about whether or not an individual was "disabled," a court must still affirm the ALJ's decision denying benefits. *Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000).

## IV.

This Court must resolve three challenges to the ALJ's denial of disability. *First*, whether the ALJ's assessment of Ms. Sombright's credibility was patently wrong. *Second*, whether the ALJ's determination of Ms. Sombright's RFC was supported by substantial evidence. *Third*, whether the ALJ made a reversible error at Step Five. We address these issues in turn.

## A.

Ms. Sombright claims that the ALJ's determination of her credibility was patently wrong. Specifically, she argues the ALJ's stated reasons for discrediting portions of her testimony regarding the intensity, persistence, and limiting effects of her back and hand impairments are inconsistent with the evidence she presented.

An ALJ may disregard a claimant's assertions if she validly finds them not credible. *Schmidt v. Astrue*, 496 F.3d 833, 843-44 (7th Cir. 2007). This credibility determination is entitled to special deference by a reviewing court and will not be overturned unless the claimant can show that the finding is "patently wrong" and unreasonable or not supported by the record. *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) (citing *Carradine v. Barnhart*, 360 F.3d 751, 758 (7th Cir. 2004)). This is because the ALJ is in the best position to see and hear the witness testifying, and thus to determine credibility. *Shramek v. Apfel*, 226 F.3d 809, 812 (7th Cir. 2000). The Court will affirm a credibility determination as long as the administrative law

judge gives specific reasons that are reasonable and supported by the record. *Skarbek v. Barnhart*, 390 F.3d 500, 505 (7th Cir. 2004).

An ALJ is not required to give full credit to every claim of impairment made by the claimant or to find that a disability exists each time a claimant states that she is unable to work. *Rucker v. Chater*, 92 F.3d 492, 496 (7th Cir. 1996). However, an ALJ's decision regarding the claimant's credibility "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." Social Security Ruling ("SSR") 96-7p; *see also Golembiewski v. Barnhart*, 322 F.3d 912, 915 (7th Cir. 2003); 20 C.F.R. § 404.1529(c)(3). Specifically, in addition to the objective medical evidence, the ALJ should consider the following, in totality, when assessing the credibility of a claimant's statements about his or her symptoms, including pain: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effect of any medication that the claimant takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the claimant uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3).

While an ALJ is not required to provide a "complete written evaluation of every piece of testimony and evidence," *Diaz*, 55 F.3d at 308, an ALJ cannot simply state that an individual's

allegations have been considered or that the individual's allegations are not credible. *Rice v. Barnhart*, 384 F.3d 363, 370 (7ᵗʰ Cir. 2004). Nor may an ALJ simply recite, without analysis, the factors that are described in the regulations for evaluating symptoms. *Zurawski*, 245 F.3d at 887.

Mindful of these standards, we consider below Ms. Sombright's challenge to the ALJ's credibility determination.

### 1.

An ALJ must consider "whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [the claimant's] statements and the rest of the evidence." 20 C.F.R. §§ 404.1529(c)(4); 416.929(c)(4). In this case, the ALJ arrived at her credibility determination by noting various discrepancies and inconsistencies in Ms. Sombright's hearing testimony. For example, the ALJ commented that Ms. Sombright repeatedly revised her estimate of what she was capable of lifting and how far she could walk. In a written statement dated January 14, 2008, Ms. Sombright claimed the ability to lift up to 40 pounds but walk only half a block due to breathing problems (R. 126). In a subsequent statement, she indicated she could walk two blocks before having to stop and catch her breath (R. 150, 153). Then, when questioned by the ALJ at the administrative hearing on November 8, 2008, she testified she could lift 20 pounds and walk a block and a half (R. 14, 34). And, later in the hearing, she testified, during questioning by her own counsel, that she could lift no more than 8.3 pounds, the weight of one gallon of milk, with her left hand (R. 14, 38-39, 41). While Ms. Sombright suggests these were innocent inconsistencies, it was within the province of the ALJ to conclude otherwise, as there was no medical evidence to explain any of these changes in capabilities.

Next, the ALJ pointed to Ms. Sombright's prior periods of unemployment and more recent failure to seek sedentary work as damaging to her credibility (R. 15). A plaintiff's "lack of effort to find work" may diminish a claimant's credibility. *Simila v. Astrue*, 573 F.3d 503, 520 (7th Cir. 2009). At the hearing in November 2008, Ms. Sombright testified that, since quitting her babysitting job in August 2007, she had not sought out sedentary work because of her deteriorating health (R. 26-27). However, in 2007, when applying for benefits, Ms. Sombright stated that she stopped working as a babysitter, because she "no longer wanted to continue doing that type of work" (R. 126). Moreover, at the hearing, after stating she cannot do her past work "due to [her] sleep, [her] breathing and [her] back" (R. 26). When the ALJ asked why she did not seek sedentary work during various periods of time, before the alleged onset of her disability, such as those between 1993-1995 and 2003-2004, Ms. Sombright stated that "I just didn't start yet. I just didn't want to work [] then" (R. 26).

The Court notes that the ALJ mentioned this testimony in her finding that no further limitations to the RFC, other than those expressly noted by her, were warranted by the evidence in the record. The Commissioner argues that this evidence reflected a lack of motivation to work and that the ALJ properly relied upon it as a basis for her decision. In support of this argument, the Commissioner cites *Simila v. Astrue*, 573 F.3d 503 (7th Cir. 2009). In *Simila*, the Seventh Circuit found that reliance on evidence that shows a "lack of effort to find work" such as claimant's declining earnings and/or failure to participate in a vocational rehabilitation program prior to the alleged onset date is permissible under 20 C.F.R. § 404.1529(c)(3). However, in *Simila*, the ALJ's reliance on such evidence was used in conjunction with the credibility determination, not with respect to the RFC determination. We see no basis for using

21

such evidence to decide the RFC; thus we find it of no consequence to Ms. Sombright's challenge to the RFC determination. With respect to the credibility determination, we find sufficient evidence without such consideration of the "lack of motivation" evidence.[25]

Next, the ALJ noted Ms. Sombright's non-compliance with her medications and her doctors' treatment plan as damaging to her credibility (R. 15). An ALJ may consider a claimant's statements less credible "if the medical reports or records show that the individual is not following the treatment as proscribed and there are no good reasons for this failure." SSR 96-7p. Failure to follow prescribed treatment can be a reason for the ALJ to not find a claimant disabled. 15 C.F.R. § 404.1530; *Ehrhart v. Secretary of Health and Human Services*, 969 F.2d 534, 538 (7th Cir. 1992) (holding that "[t]he Secretary may not find total disability when a claimant inexcusably refuses to follow a prescribed course of medical treatment that would eliminate [her] total disability."). When Ms. Sombright visited the St. Francis clinic on July 17, 2008, it was noted that she had stopped taking her prescription medications (R. 15, 328). Ms. Sombright suggests in her brief this was due to her need for refills and not as a result of non-compliance (Pl.'s Reply at 9). However, the medical report did not state that this was the cause of Ms. Sombright's non-compliance (R. 328). Plaintiff suggests that those, like Ms. Sombright, who are indigent more often run out of prescription medications than do others, and thus are more often involuntarily non-compliant for financial reasons (Pl.'s Reply at 9). However, by this argument, Ms. Sombright asks us to draw a different inference from the doctor's note than

---

[25] As for the Commissioner's argument that the ALJ's reliance on Ms. Sombright's poverty was permissible as a basis for finding Ms. Sombright's allegations less than credible, we find the reliance on *Rogers v. Barnhart*, 446 F. Supp.2d 828, 834 (N.D. Ill. 2006) to be inapposite (the court there did not find that the ALJ relied on evidence of poverty); and we find the case of *Ramirez v. Barnhart*, 292 F.3d 576, 582 n.4 (8th Cir. 2002), to be very weak support. We therefore do not rely on the evidence of Ms. Sombright's poverty as a basis for affirming the ALJ's credibility of RFC determinations.

the ALJ drew. The Court is not permitted to do this unless we can say that the ALJ's inference was patently wrong. We cannot make that finding on this record.

The ALJ also noted that Ms. Sombright failed to heed her doctor's repeated orders to stop smoking, drinking, lose weight, and adopt a healthier lifestyle. The ALJ's conclusion here is well-supported by evidence in the record. On numerous occasions, Ms. Sombright's doctors told her that many of her conditions, including her breathing difficulties, obesity, and osteopenia, were related to her continued choice to smoke, not lose weight, and not make dietary modifications (R. 262, 327-330). For example, in July 2008 and August 2008, she was described as non-compliant with treatment, as she was still smoking and needed to return to a dietician to adopt a healthier lifestyle (R. 327-328). In October 2008, when she complained of a four-day history of low back pain, Ms. Sombright weighed 233 pounds and was again advised to lose weight (R. 331-332). And, at the date of her hearing, Ms. Sombright still smoked five cigarettes per week, drank occasionally, and had gained 11 pounds over the course of the prior six months (R. 15). While the ALJ noted that Ms. Sombright had decreased her smoking and drinking, the ALJ concluded that Ms. Sombright's continued use of both and failure to lose any weight represented non-compliance with her doctors' repeated instructions (R. 15).

Doctors also recommended that Ms. Sombright undergo turbinate resection and septoplasty surgery to alleviate her obstructive sleep apnea. As the ALJ notes, Ms. Sombright refused the surgery because she was afraid (R. 30), despite the fact that Ms. Sombright had a total abdominal hysterectomy and oophorectomy in 1996, following a diagnosis of fibroids (R. 30, 255). Contrary to Ms. Sombright's belief, the ALJ did not base her credibility decision on Ms. Sombright's refusal to undergo surgery. Instead, the ALJ emphasized that her credibility

**23**

finding was based on Ms. Sombright's "main difficulties" (R. 15), namely her obesity and tobacco abuse. The ALJ expressly found that Ms. Sombright's failure to address and correct these two main causes of her impairments was a reason to discredit her statements concerning the intensity, persistence and limiting effects of her claimed symptoms.

Finally, the ALJ discredited Ms. Sombright's allegations regarding the severity of her lower back pain because "[o]bjective evidence regarding low back pain is minimal at best, and she acknowledged at [the] hearing that related medication is helpful" (R. 15). The ALJ was on firm legal and factual ground in making this observation. *See also* 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(d); 20 C.F.R. §§ 404.1529(b), 416.929(b). "[S]ubjective complaints need not be accepted insofar as they clash with other, objective medical evidence in the record." *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007). Discrepancies between objective evidence and self-reports may be evidence of symptom exaggeration. *Sienkiewicz v. Barnhart*, 409 F.3d 798, 804 (7th Cir. 2005).

Following Ms. Sombright's initial complaint of back pain on January 10, 2008, which was diagnosed as a "lumbar strain," an x-ray was performed on January 14, 2008. This x-ray revealed "no evidence of acute fracture," "mild degenerative changes," "minimal loss of height of the L3-4 and L4-5 intervertebral disc spaces as well as the L2-3 intervertebral disc space," and "[s]light hypertrophy of the posterior elements . . . at the L5-S1 level" (R. 200). While the report did note "diffuse anterior osteophyte formations," which Ms. Sombright highlights in her briefs, it did not result in any change in her original diagnosis (R. 195). The ALJ also found it important that Ms. Sombright responded to anti-inflammatory drugs and muscle relaxants, while she complained of the back pain only once in her six plus doctors' visits since the x-ray (R. 28-

24

29). A claimant's use of over-the-counter medication for pain relief can support the conclusion that she was not disabled by pain. *Donahue v. Barnhart*, 279 F.3d 441, 444 (7th Cir. 2002). Here, Ms. Sombright used such medication effectively. Thus, the ALJ concluded that this lack of objective evidence, coupled with Ms. Sombright's infrequent complaints, made her claims less credible.

The ALJ also found that the right hand condition described by Ms. Sombright lacks evidentiary support. On May 22, 2008, Ms. Sombright complained of "stiffness" in her hand (R. 326). The treating physician ordered no tests and prescribed no treatment (*Id.*). There was no formal diagnosis of the condition in the doctor's report (*Id.*). Moreover, because Ms. Sombright did not register this complaint in any other doctor's visit and did not receive any treatment for it, the ALJ found no additional "medical signs or laboratory findings" which "demonstrate[s] the existence of a medically determinable physical . . . impairment that could reasonably be expected to produce [her] symptoms." SSR 96-7p; *see also Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000) (holding that complaints of severe pain may not be credible given "the absence of drugs prescribed for severe pain"). Without such evidence, the ALJ concluded the severity of Ms. Sombright's hand condition was questionable.

We recognize that the ALJ's statement that the plaintiff's testimony was not credible to the extent it was inconsistent with the RFC (R. 15) comes close to the kind of boilerplate language the Seventh Circuit has criticized. *Parker v. Astrue*, 597 F.3d 920, 921-22 (7th Cir. 2010) (statement that a plaintiff was "not entirely credible" is "meaningless" because it "yields no clue as to what weight the trier of fact gave the testimony"). But, the ALJ here did not stop with that conclusory statement. Instead the ALJ gave reasons why she rejected Ms. Sombright's

**25**

statements of limitations that greater than those in the RFC. Moreover, the ALJ made this determination in light of the administrative record as a whole, considering Ms. Sombright's hearing testimony, employment history, treatment history, and medical diagnoses. Based on our review of the record, the ALJ relied on substantial evidence in making the credibility determination, and formed the requisite logical bridge between the evidence provided and the credibility determination. Thus, we cannot say the ALJ's credibility determination was patently wrong.

## B.

Ms. Sombright alleges that the ALJ's RFC finding is based on legal error, because she did not consider all of the evidence regarding her impairments (Pl.'s Mem. at 12-14; Pl.'s Reply at 4-12). In particular, Ms. Sombright alleges that the ALJ did not give proper weight to her severe OSA and related daytime somnolence,[26] improperly discounted her hand impairment and back pain, and failed to incorporate the combined effect of her obesity with her other impairments (Pl's Reply at 4-12). She claims that, together, these impairments prevent her from performing light level jobs (*id.*), which require a person to be standing or walking for most of the workday. SSR 83-10, 83-14.

A claimant's RFC is the "individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis." SSR 96-8p; *see also* 20 C.F.R. § 416.645. A "regular and continuing basis" means "8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p. The RFC determination is a legal decision rather than a medical one, which must be supported by substantial evidence and an adequate discussion of the issues. 20 C.F.R. § 404.1527(e)(2); *Diaz*, 55 F.3d at 306 n.2. To make this determination,

---

[26] Somnolence is an inclination to sleep. *Stedman's Medical Dictionary, supra*, at 468.

the ALJ must consider all of the relevant evidence, including objective medical evidence, treatment, physicians' opinions and observations, and the claimant's own statements about her limitations. 20 C.F.R. §§404.1520(e); 404.1545(a); 416.920(e); 416.945; SSR 96-8p; *see also Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009) ("[A]n ALJ must consider the combined effects of all of the claimant's impairments, even those that would not be considered severe in isolation.").

Although medical opinions bear strongly upon the determination of the RFC, they are not conclusive; the determination is left to the Commissioner who must resolve any discrepancies in the evidence and base a decision upon the record as a whole. 20 C.F.R. § 404.1527(e)(2); *see also Diaz*, 55 F.3d at 306 n.2. However, the ALJ need not "evaluate in writing every single piece of testimony and evidence submitted." *Zalewski v. Heckler*, 760 F.2d 160, 166 (7th Cir. 1985). Rather, the ALJ "must only minimally articulate his or her justification for rejecting or accepting specific evidence of disability." *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008). If an "entire line[] of evidence" is rejected, the ALJ must provide reasons. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994).

In determining Ms. Sombright's RFC, the ALJ reviewed and considered the reports created by her doctors in conjunction with her own testimony (R. 13-15). In accordance with 20 C.F.R. § 404.1520, the ALJ found at Step Two that Ms. Sombright suffers from four severe impairments: (1) OSA; (2) myalgias; (3) obesity; and (4) tobacco abuse (R. 13). The ALJ further acknowledged that the OSA and associated breathing difficulties prevented Ms. Sombright from sleeping more than two hours at a time at night, despite use of a CPAP machine, and that surgery had been recommended for this condition (R. 14). The testimony by

Ms. Sombright that she "wakes up gagging" (R. 38), which plaintiff criticizes the ALJ for omitting, is irrelevant because it has no bearing on Ms. Sombright's ability to work. The key finding, how much sleep Ms. Sombright is able to get when using the CPAP machine, was properly considered, because the ALJ noted that Ms. Sombright is only able to sleep at two hour intervals at night (R. 13).

The ALJ did not make express findings regarding the effect of Ms. Sombright's testimony regarding "daytime somnalence" and the relationship it has to her OSA, as well as the effect, if any, it has on her RFC. The ALJ, instead, found that Ms. Sombright's "subjective allegations" (R. 16), her "alleged symptoms" and "statements concerning the intensity and persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment" (R. 15). Ms. Sombright challenges this kind of language, calling it "boilerplate" (Pl.'s Mem. at 8; Pl.'s Reply at 2). The Court disagrees. Although a lack of articulation regarding important evidence that could support a finding in a claimant's favor is a basis for remand, we find that the ALJ's analysis permits meaningful judicial review because it permits a "glimpse" into her reasoning and draws the relevant connections necessary to assess the validity of her findings. For example, in making her RFC determination, the ALJ found that the objective evidence of sleep disturbances at night did not support further RFC limitations, despite well-documented evidence that Ms. Sombright needs to use a CPAP machine and has a severe impairment (R. 263). In contrast, the evidence of daytime somnolence and its connection, if any, to the OSA and her claimed inability to work, is based solely on her own testimony. Because we find the ALJ's determination regarding the

RFC finding and OSA to be based on substantial evidence, we see no reason to question the ALJ's omission of express findings as to the alleged daytime somnolence.

Next, the ALJ found held that Ms. Sombright's hand pain and foot swelling were not severe impairments that would affect her RFC because they were subjective complaints that were not substantiated by objective medical evidence (R. 13). Indeed, aside from her testimony, which the ALJ acknowledged, Ms. Sombright made only a single complaint of right hand pain and stiffness, on May 22, 2008, which is the only documentation that exists in the evidentiary record (R. 326). As Ms. Sombright was represented by counsel at the hearing, it is presumed that this is the best evidence she could offer in support of this alleged severe impairment. *See Sears v. Bowen*, 840 F.2d 394, 402 (7th Cir. 1988) (holding that when a claimant is represented by counsel, the ALJ is entitled to presume that she has made her best case).

The ALJ also found that Ms. Sombright's myalgias, or back pain, which she claimed prevents her from standing for no more than one hour and sitting for no more than a half-hour (R. 34), did not support any further limitations to the RFC (R. 14). As discussed with respect to the credibility finding, the only objective evidence offered by Ms. Sombright related to back pain was the January 14, 2008 x-ray, which concluded that there was: (1) "no evidence of acute fracture"; (2) only "mild degenerative changes with diffuse anterior osteophyte formation"; (3) "minimal loss of height" in the "intervertebral disc spaces" and (4) only "slight hypertrophy" (R. 200). The x-ray does not provide evidence of a severe impairment, let alone a disabling one. The ALJ was therefore permitted to leave that evidence out of her analysis. *See Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (ALJ not required to evaluate in writing every medical record submitted to her). Ms. Sombright argues we should find the lack of discussion "unacceptable"

(Pl.'s Reply at 2). But, remanding this case for failure to discuss the x-ray would require us to find that the x-ray has potential significance that both the ALJ and the medical personnel declined to ascribe to it. In effect, by this argument, Ms. Sombright is asking us to do something beyond the authority our limited judicial review, namely, it asks us to "displace the ALJ's judgment by reconsidering facts or evidence. . . ." *See Simila*, 573 F.3d at 513. That, we decline to do.

Moreover, the ALJ did note that Ms. Sombright complained about back pain only once in her six plus doctor's visits since the initial complaint, while she testified that conservative treatment, specifically over-the-counter anti-inflammatory drugs and muscle relaxants, alleviated the pain (R. 28-29, 169-170, 332). A claimant's statements may be found less than credible if "the level or frequency of treatment is inconsistent with the level of complaints." SSR 96-7p. Although Ms. Sombright attempts to explain the sparse medical record by suggesting she did not have the funds to go a specialist for additional treatment (Pl.'s Reply at 9), the medical record that does exist supports the ALJ's finding that this condition was not severe. Ms. Sombright's statements that she could not stand or sit for the durations required by the light work RFC finding were further undermined by inconsistent testimony (R. 14, 34, 38-39, 126, 150, 153). For these reasons, substantial evidence supported the ALJ's finding that "[o]bjective evidence regarding [Ms. Sombright's] low back pain is minimal at best," labeling it as a "myalgia," and discounting its severity in the RFC (R. 14).

Finally, the ALJ adequately considered the combined effect of obesity on Ms. Sombright's other impairments in her RFC, as is required under SSR 02-1p: Policy Interpretation Ruling Titles II and XVI: Evaluation of Obesity, 67 Fed. Reg. 57859 (Sept. 12,

2002).   Obesity was removed by the Social Security Administration from the Listing of Impairments that are automatically disabling in 1999.  Pursuant to SSR 02-1p, while the ALJ is directed to evaluate each case based on the information in the record, she cannot "make assumptions about the severity or functional effects of obesity combined with other impairments" since "[o]besity in combination with another impairment may or may not increase the severity or functional limitations of the other impairment."  SSR 02-1p; *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).  It is sufficient for the ALJ to indirectly and implicitly consider obesity by relying on doctor's reports that considered claimant's obesity.  *Prochaska*, 454 F.3d at 736-37; *see also Skarbek*, 390 F.3d at 504.

The ALJ determined and acknowledged that Ms. Sombright's obesity was a severe impairment (R. 13).  In fact, the ALJ found that "the record indicates that the claimant's main difficulties stem from obesity as well as tobacco abuse . . . " (R. 15).  The ALJ also considered Ms. Sombright's obesity in connection with her other conditions, relying on the opinions of the two state agency (R. 5, 313, 323) medical consultants who explicitly considered obesity when evaluating plaintiff's RFC.  The opinions of these physicians, Dr. Robert Patey and Dr. Ernst Bone, are sufficient to support the ALJ's analysis and conclusion regarding Ms. Sombright's obesity, especially in light of the fact that Ms. Sombright's treating physicians did not contradict these opinions in any of their progress notes.   The ALJ's explicit acknowledgment and consideration of obesity as a severe impairment, coupled with the consultants' explicit consideration of the impact of the condition on Ms. Sombright's other impairments, including OSA, satisfied the requirements of SSR 02-01p and provides substantial evidence for her RFC (R. 13-15).

31

The ALJ has sufficiently articulated her reasons for relying on state agency medical consultants' opinions, determining that Ms. Sombright could perform light level work, and giving less weight to Ms. Sombright's subjective complaints. The ALJ also has adequately considered the combined effect of Ms. Sombright's obesity and her other conditions.

## C.

If the claimant cannot perform her past relevant work at Step 4, then, at Step 5, the ALJ must determine if she can perform other work. 20 C.F.R. § 404.1520(g). If the claimant can perform a significant number of jobs available in the economy then the claimant is not disabled. 20 C.F.R. § 404.1520(g). Ms. Sombright argues that the ALJ erred at Step 5, by failing to provide an accurate hypothetical to the VE which took into account all of her symptoms and impairments as she describes them. On this basis, she argues the conclusion of the VE upon which the ALJ relied to find that she is not disabled in Step 5 cannot be upheld as supported by substantial evidence (Pl.'s Mem. at 13-14).

Specifically, Ms. Sombright contends that the ALJ failed to incorporate her severe lower back pain, habitual daytime somnolence, and her persistent hand weakness, which together prevent her from performing even sedentary work full-time (Pl.'s Mem. at 4-12). Sedentary work would require her to sit 6-8 hours and stand/walk at least 6 hours out of an 8-hour workday, and lift 10 pounds frequently and 20 pounds occasionally. 20 C.F.R. §§ 404.1567(b), 416.967(b); SSR 83-10, 83-14.

The ALJ stated in her RFC determination that she did not find Ms. Sombright's self-reported impairments and the limitations they imposed credible because – among other things – the record contained scant objective medical evidence in support of them (R. 14-15). To form

**32**

her hypothetical, the ALJ instead relied upon an RFC that was consistent with the evidence from Ms. Sombright's treating physicians and the opinions provided by the two state agency medical consultants (R. 15).

The state physicians are considered "highly qualified . . . experts in Social Security disability evaluation." 20 C.F.R. §§ 404.1527(f)(2)(I); 416.927(f)(2)(I). They explicitly considered the symptoms asserted by Ms. Sombright in her brief, including obesity, OSA, hyperlipidemia, osteopenia, hot flashes, hand stiffness, and lower back pain, along with her medical records and tests, including the x-ray of her lumbar spine (R. 314, 322).

The ALJ's ultimate RFC was a virtual carbon copy of that of the state agency medical consultants and did not contradict any medical evidence (R. 14-17). Dr. Patey, the first consultant, diagnosed Ms. Sombright with obesity and OSA (R. 313). He acknowledged her back pain, but noted that, despite the diffuse anterior osteophyte formations and minor degenerative changes noted in the x-ray to which Ms. Sombright repeatedly calls our attention, it was "secondary to muscle strain" and found "no trauma" (R. 314). He also noted that her hot flashes were stable (R. 314). Dr. Bone, the second consultant, reviewed all of the relevant medical evidence, including the x-ray, and affirmed Dr. Patey's RFC (R. 321-323). He also found, moreover, that Ms. Sombright's "credibility is at question; and her condition is not as severe as she describes it" (R. 323).

Accordingly, both state agency medical consultants determined, and the ALJ consequently found, that Ms. Sombright was capable of light exertional work with certain limitations regarding climbing ladders, ropes, or scaffolds; concentrated exposure to pulmonary irritants; and climbing stairs and/or ramps more than occasionally (R. 14-16, 313-320, 320-323).

The consultant's opinions are based on and entirely consistent with the medical evidence (*Id.*). When an ALJ adopts those limitations suggested by the reviewing doctors, who were aware of the claimant's condition, then the ALJ has factored those conditions indirectly into her decision as part of the doctors' opinions. *Skarbek*, 390 F.3d at 504.

Further, since Ms. Sombright's treating physicians did not provide an assessment of her functional capacity, they did not impose any greater limitations than the state agency medical consultants. *See Rice*, 384 F.3d at 370 (holding the ALJ did not err in relying on opinions from state agency medical consultants where there was "no doctor's opinion contained in the record which indicated greater limitations than those found by the ALJ."); *see also Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008) (holding that when the treating physician's opinion is based solely on the patient's subjective complaints, the ALJ may discount it and rely on the state agency medical consultant[s]); *Eichstadt v. Astrue*, 534 F.3d 663, 668 (7th Cir. 2008) (stating that "[t]he claimant bears the burden of producing medical evidence that supports her claims of disability."). The ALJ's decision not to call a medical expert was therefore not reversible error, as there were no medical inconsistencies to resolve. *See generally, Skarbek v. Barnhart,* 390 F.3d 500, 504 (7th Cir. 2004) (citing 20 C.F.R. § 416.919a). *See also Jirau v. Astrue*, 715 F. Supp.2d 814, 826 (N.D. Ill. 2010). As the consulting physicians' opinions are consistent with the ALJ's RFC finding, and uncontradicted by Ms. Sombright's primary physicians, there is no basis for Ms. Sombright's claim that the ALJ was playing the role of doctor.

Thus, while the ALJ's hypothetical to the VE did not include all of Ms. Sombright's claimed impairments, as she described them, the ALJ was under no obligation to incorporate into her hypotheticals any impairments and limitations that were discredited. *See Schmidt*, 201 F.3d

34

at 846. We find that the hypothetical the ALJ posed to the VE was supported by substantial evidence.

The neutral VE testified that someone with Ms. Sombright's RFC would be able to perform the duties of a hand packer, cashier, and cafeteria attendant (R. 43-44). The VE also opined that more than 117,096 of these jobs exist in Chicago and the surrounding counties as of the third quarter of 2007 (R. 43-48). This number is more than sufficient, even if some of the jobs are part-time, to meet the Commissioner's burden at Step 5 to show that Ms. Sombright could perform a substantial number of full time jobs available in the national economy. *Liskowitz v. Astrue*, 559 F.3d 736, 743 (7th Cir. 2009). The same is true even if Ms. Sombright were limited to sedentary work, as the VE testified to more than 56,000 such jobs in the greater Chicago area (R. 48-49).

## CONCLUSION

While Ms. Sombright undoubtedly lives with a number of conditions or impairments that restrict her ability to function, not all conditions or impairments render a person disabled under the Act. Based on our review and for the above reasons given above, the Court concludes that the ALJ provided sufficient articulation in support of her credibility determination such that is not patently wrong. Further, her determination of Ms. Sombright's RFC is supported by substantial evidence in the record. Finally, the ALJ's conclusion at Step 5 of the disability analysis contained no reversible error.

Accordingly, this Court directs the Clerk of the Court to enter judgment denying Ms. Sombright's motion for summary remand (doc. # 22) and affirming the Commissioner's denial of benefits, as requested in the Commissioner's brief (doc. # 24).

ENTER:

SIDNEY I. SCHENKIER
United States Magistrate Judge

Dated: April 6, 2011